In re RABEX OF COLORADO, INC., a Colorado corporation, d/b/a the Breckenridge Hilton Resort, and A.G.C. Management Enterprises, Inc., a Nevada corporation, Debtors.

RABEX OF COLORADO, INC., A.G.C. Management Enterprises, Inc. and Official Unsecured Creditors' Committee of Rabex of Colorado, Inc. Appellants,

v.

Thomas G. REED, III, Trustee of the bankruptcy estate of L & N Associates, Ltd., Appellee.

No. CIV.A. 98–K–1838.
Bankruptcy Nos. 97–15446
DEC, 97–15725 DEC.

United States District Court,
D. Colorado.

Nov. 13, 1998.

Jerry N. Jones, Moye, Giles, O'Keefe, Vermeire & Gorrell, Joel E. Laufer, Holden, Padjen & Laufer, LLC, Denver, CO, for Rabex of Colorado, Inc.

Caroline C. Fuller, Fairffield & Woods, P.C., Denver, CO, for A.G.C. Management Enterprises, Inc.

Christian C. Onsager, Michael J. Pankow, Faegre & Benson, LLP, Denver, CO, for Official Unsecured Creditors' Committee of Rabex of Colorado, Inc.

Glenn W. Merrick, Brega & Winters, P.C., Denver, CO, for Thomas G. Reed, III.

## MEMORANDUM DECISION ON APPEAL

KANE, Senior District Judge.

The sole issue in these appeals is the priority to be given an alter ego claim in bankruptcy. The Appellants uniformly dispute the bankruptcy court's treatment of the general rule that subordination be premised on the inequitable conduct of the creditor as an absolute rule barring subordination in the absence of such conduct. Appellants maintain the rule is not absolute and that it must yield, in the appropriate case, to the equally valid rule that equitable remedies should be subject to the intervening rights of innocent third parties. Particularly here, where a judgment creditor seeks a remedy not against its debtor, but against a third-party under an alter ego theory, Appellants argue the rights of that third-party's direct creditors should predominate. Alternatively, Appellants dispute the bankruptcy court's finding that the creditor's conduct was not inequitable as would warrant subordination. Though I do not accept the bankruptcy court's analysis, I affirm for the reasons stated in this opinion.

## I. FACTS.

Rabex of Colorado, Inc. ("Rabex–Colorado"), A.G.C. Management Enterprises, Inc. ("AGC"), and the Official Unsecured Creditors' Committee of Rabex ("Creditors' Committee") appeal from Judge Cordova's August 13, 1998, Order Denying Confirmation of Plan in the Rabex and AGC Chapter 11 cases. Specifically, these Appellants challenge the bankruptcy court's refusal to subordinate the claim of Reed, the Chapter 7 Bankruptcy Trustee for the estate of L & N Associates, Ltd. in a Florida bankruptcy case, who holds an $8 million judgment against Rabex–Japan in that case. Reed has recorded the judgment in Colorado and asserts it as a claim against Rabex–Colorado pursuant to a reverse piercing-the-corporate-veil/alter ego theory.

Appellee Thomas G. Reed, III, is the Trustee of the Bankruptcy Estate of L & N Associates, Ltd. ("L & N"), a Florida limited partnership which did business in Pensacola, Florida. In 1990 or 1991, L & N acquired a resort property in Pensacola pursuant to an agreement with Rabex Japan, Ltd. ("Rabex–Japan") that provided Rabex–Japan would purchase the property from L & N for $17 million. According to Reed, Rabex–Japan reneged on its agreement and converted the funds and credit it had committed to L & N to acquire the Breckenridge Hilton through a newly formed and wholly-owned subsidiary, Rabex–Colorado, Inc. ("Rabex–Colorado"). Reed asserts the default by Rabex–Japan forced L & N into Chapter 7 bankruptcy proceedings in Pensacola and left L & N's creditors holding tens of millions of dollars in unpaid claims.

In 1992, Reed brought suit against Rabex–Japan in the United States District Court for the Northern District of Florida, *Reed v. Rabex Japan, Ltd.*, Case No. 92–30245RV (the "Florida Action"). The litigation culminated in January 1995 with an $8 million judgment being entered against Rabex–Japan and in favor of Reed. With postjudgment interest the Florida judgment now exceeds $9 million, of which no portion has been paid.

In February 1996, out of concern that Rabex–Japan was attempting to liquidate the

assets of its American subsidiaries in an effort to avoid the Florida judgment, the Florida District Court entered an order authorizing the registration of the judgment in Colorado. On March 4, 1996, Reed recorded the Florida judgment in Colorado pursuant to 28 U.S.C. § 1963. *See Reed v. Rabex–Japan, Ltd.,* Civil Action No. 96–J–8 (the "Colorado Federal Court Judgment"). Reed recorded the transcript of the judgment proceedings in Summit County which, according to Reed, created a lien upon the Breckenridge property Rabex–Japan owned pursuant to Colo.Rev.Stat. § 13–52–104.

On December 10, 1996, Reed filed suit against Rabex–Colorado, Rabex Management Colorado and AGC, asserting claims for piercing the corporate veil/alter ego, fraudulent conveyance, civil conspiracy, and for foreclosure on the lien. Shortly thereafter, Reed filed a notice of *lis pendens* against the Summit County real property owned by Rabex Colorado and AGC, on the theory that the assets of Rabex–Colorado and AGC were properly regarded as assets of Rabex–Japan under the alter ego doctrine.

In April 1997, Rabex–Colorado and AGC (jointly referred to as "Debtors") filed for Chapter 11 reorganization in the United States Bankruptcy Court for the District of Colorado. Debtors filed their Second Amended Joint Plan of Reorganization ("Plan") on April 17, 1998, and an Addendum to the Plan on June 17, 1998. The amended Plan called for the subordination of Reed's claim to the claims of all other unsecured creditors under 11 U.S.C. § 510(c), based on Debtors' assertion, among other things, that Reed's lien and *lis pendens* slandered their title to the Summit County property.

After a hearing on July 30, 1998, the bankruptcy court refused to subordinate Reed's claim and denied confirmation on that basis. *See* Order Denying Confirmation of Plan (Appellants' J. A., Tab 9) at 3. The court

offered two reasons for its conclusion. First, it rejected Debtors' assertion that reverse-piercing/alter ego claims should, by their very nature, be junior to claims of "direct" creditors. The court found no authority to support the assertion and determined, to the contrary, that Reed's claim was not different from any other unsecured creditor claim. If found to be valid in an adversary proceeding,[1] the court reasoned, Reed's claim would entitle him to disregard corporate form such that Reed would hold a claim against Rabex–Colorado as well as Rabex–Japan. Order at 3–4.

Second, the court relied on Tenth Circuit law requiring proof of inequitable conduct on the part of a claimant before his claim could be subordinated under § 510(c), and found Debtors had failed to show such conduct on the part of Reed. The court denied confirmation and ordered Debtors to submit an amended Plan by September 14, 1998. Instead, the Debtors and Creditors' Committee appealed.[2]

## II. *DISCUSSION.*

 In arguing Reed's claim may be subordinated despite the lack of any inequitable conduct on his part, Appellants rely on the fundamental proposition that bankruptcy courts' equitable powers allow them to "sift the circumstances" surrounding any claim in bankruptcy "to see that injustice or unfairness is not done in the administration of the estate." *Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 84 L.Ed. 281 (1939). The court's equitable powers allow it to produce fair and just results "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Id.* at 305, 60 S.Ct. 238.

 The judicially-created doctrine of equitable subordination developed as a policy

---

1. I note that for purposes of the confirmation hearing, the parties agreed, and the court assumed pursuant to 11 U.S.C. § 1129(a), the validity of Reed's reverse-piercing/alter ego claim. *See* Rep. Tr. 7/30/98 Confirmation Hg. (Apples.' J.A. Tab 7) at p. 28.

2. Out of concern the August 13 Order may be considered interlocutory rather than final for the purposes of Bank. Rule 8001(a), Debtors and Creditors' Committee filed both notices of appeal as well as individual Motions for Leave to Appeal pursuant to Bank. Rule 8003. I granted the Motions for Leave to Appeal, as well as Debtors' Motion to Expedite, on September 9, 1998.

against fraud and the breach of the duties imposed on a fiduciary of the bankrupt. *Pepper,* 308 U.S. at 311, 60 S.Ct. 238. Section 510(c) is a codification of this doctrine, and provides that:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

The Tenth Circuit has adopted a three-part test for equitable subordination. A party seeking equitable subordination under § 510(c) must demonstrate:

1. The claimant has engaged in inequitable conduct;

2. The conduct has injured creditors or given unfair advantage to the claimant; and,

3. Subordination of the claim is not inconsistent [sic] with the Bankruptcy Code. *Sloan v. Zions First Nat'l Bank,* 990 F.2d 551, 559 (10th Cir.1993)(quoting *5000 Skelly Corp.,* 142 B.R. 442, 446 (Bank.N.D.Okla. 1992)).

Given the breadth of § 510(c) and the nature of bankruptcy courts' equitable jurisdiction generally, Appellants urge a flexible approach to subordination requiring courts to consider each request under the particular circumstances and facts of the case. Appellants note that inequitable conduct on the part of the creditor whose claim is to be subordinated is only the "general" rule, *see United States v. Reorganized CF&I Fabricators of Utah, Inc. (In re CF&I),* 53 F.3d 1155, 1158 (10th Cir.1995) [3], and cite other Tenth Circuit cases to support the assertion that "courts have routinely reordered priorities [of bankruptcy claims] in order to prevent prejudice to innocent creditors of a company that is the subject of an alter ego or substantive consolidation claim." Debtors' Reply at pp. 1–2 (citing *In re Gulfco Inv. Corp.,* 593 F.2d 921 (10th Cir.1979) and *Fish v. East,* 114 F.2d 177 (10th Cir.1940)).

■ I agree that the bankruptcy court's equitable jurisdiction is not amenable to inflexible tests for its application, but I disagree that the flexible approach urged by Appellants requires any substantively different analysis or outcome in this case.

To support their position Appellants rely on *In re Virtual Network Servs.,* 902 F.2d 1246, 1249–50 (7th Cir.1990), a case in which the Seventh Circuit adopted a flexible test for equitable subordination. The test requires courts to "look to the origin and nature of an unsecured claim" to decide whether equity "requires that it be subordinated to claims of other general unsecured creditors." *In re Envirodyne Indus., Inc.,* 79 F.3d 579, 582 (7th Cir.1996)(discussing *Virtual Network*). In articulating the standard, the Seventh Circuit looked to the legislative history of § 510(c), concluding that in enacting the provision, "Congress intended to give courts authority for developing principles of equitable subordination—principles that may or may not include a requirement of inequitable conduct." *Id.* See 124 Cong. Rec. 32398 (daily ed. Sept. 28, 1978)(remarks of Rep. Edwards); 124 Cong. Rec. 33998 (daily ed. Oct. 6, 1978)(remarks of Sen. DeConcini)(equitable subordination is to be invoked according to case law existing at the time of codification, with development of the concept being left to the courts). Applying the flexible approach, the court in *Virtual Network* determined proof of inequitable conduct was not necessary for subordination of nonpecuniary loss tax penalty claims.[4]

---

**3.** *See generally Collier on Bankruptcy,* ¶ 510.05[3][c] at p. 510–20 (15th ed. 1998)("Regardless of the nature of the claimant's relationship with the debtor, equitable subordination is not generally justified in the absence of some inequitable conduct").

**4.** The bankruptcy court in the instant case distinguished *Virtual Network* as dealing with the subordination of tax penalties only, but the Seventh Circuit made clear that its holding in *Virtual* was not so limited. *Envirodyne,* 79 F.3d at 582 (Virtual Network's "limited holding takes nothing away from our general interpretation of Section 510(c) .... The flexible approach of Virtual Net-

■ In my view, neither *Sloan* specifically, nor Tenth Circuit jurisprudence generally, precludes application of the flexible test under appropriate circumstances and application of the flexible test in any event would not would not alter the outcome here. *Envirodyne* is instructive in this regard. In *Envirodyne*, the corporation resulting from a merger of its predecessor corporation sought the equitable subordination of claims of creditors who failed to tender their shares of stock in the former corporation or to redeem their shares before the corporation filed for bankruptcy. Although the stockholder/creditors were legally creditors of the new corporation, the court looked to the "origin and nature" of these creditors' claims and determined they were, "in substance, based on equity interests" and more akin to stock redemption claims than general unsecured claims. 79 F.3d at 583. "When [these creditors] invested in Former Envirodyne, they positioned themselves to benefit if the company performed well, but they also accepted the risk that the company might perform poorly." 79 F.3d at 583. Finding their status as creditors arose from their failure to tender shares in the short-form merger under Delaware law and that "no amount of maneuvering can obscure the true nature of [their] interest," the court agreed subordination was proper and, given the creditors' "dilatory behavior" in failing to redeem their shares, "even more compelling here than in a stock redemption case." *Id.*

Applying the Seventh Circuit approach here, it is clear Reed's claim is more akin to that of the secured creditor in *Sloan*, whose interest the Tenth Circuit declined to subordinate. In *Sloan*, the bankruptcy court denied the trustee's request that the secured claim of Zions Bank be subordinated to the claims of unsecured creditors because the bank had attached liens and otherwise controlled the debtor, a clothing retailer, to its own benefit and the detriment of the other creditors. 990 F.2d at 559. The court looked to the nature of the complained of transaction, and saw nothing inequitable in Zions' conduct:

'The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender.'

*Sloan*, 990 F.2d at 559 (quoting *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 701 (5th Cir.1990)). Agreeing with the bankruptcy court that Zions's conduct was nothing more than action taken to protect and enforce a "valid, properly perfected and enforceable security interest in all of debtor's inventory," the Tenth Circuit ruled subordination of the bank's claim based on such conduct would be " 'completely improper.' " 990 F.2d at 558–59 (quoting bankruptcy court). Zions " 'was simply exercising the contract rights that it had, and there's nothing wrong with that.' " *Id.*

Applying the flexible approach urged by Appellants, the "true nature" of Reed's claim in the instant case is that of a judgment creditor hoping to enforce a valid judgment against his debtor's alleged alter ego. Once the validity of his alter ego theory is presumed, Reed's claim does not differ from a direct claim of any other "innocent creditor" of Rabex–Colorado. Moreover, Reed represents the estate of L & N, not the estate of Rabex–Colorado's alleged alter ego.[5] At this

---

work makes sense in light of the Bankruptcy Code's primary goal of equality of distribution and the fluid concept of equity at the heart of Section 510(c) subordination").

**5.** The distinction is significant and reveals a fundamental error in Debtors' arguments on appeal. During oral argument, counsel for Debtors urged me to reverse the bankruptcy court's refusal to subordinate Reed's alter ego claim because, counsel argued, the doctrine of equitable subordination was developed for the very purpose of protecting innocent creditors in the event of such

a claim. Counsel cited *Pepper v. Litton* for this proposition, but *Litton* does not support reversal in this case. In *Litton*, the Supreme Court upheld the subordination of a claim asserted by a dominant and controlling stockholder of a bankrupt corporation who had allowed his salary claims to lie dormant only to attempt to enforce them after the corporation became insolvent. 308 U.S. at 311–312, 60 S.Ct. 238. The Court found the stockholder, Litton, used his position as an insider "not to deal fairly with the creditors of [the] company but to manipulate its affairs in

stage of the proceedings, Reed's actions in pursuing and protecting the Florida judgment have been shown to be nothing other than arms-length and lawful exercises of his rights as a judgment creditor. Under *Sloan,* such conduct alone will not support subordination. *Accord Litton,* 308 U.S. at 306–07, 60 S.Ct. 238 (the essence of the inquiry into the true nature of the transaction between one whose claim is sought to be subordinated and the corporation "is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain . . . [i]f it does not, equity will set it aside").

*Fish* and its progeny compel no different result. In *Fish,* the Tenth Circuit articulated the ten factors to be considered in determining alter ego status and affirmed an order for turnover of assets fraudulently transferred from Mines Company to its alter ego, Placers Company. In ordering turnover, the court stated Placers's creditors "may be entitled to be paid from the Placers Company in preference to the claims of the Mines Company" but went no further than to say "[s]uch questions may be raised [footnote citing *Carroll v. Stern,* 223 F. 723 (6th Cir.1915)] and protection sought." 114 F.2d at 199. Should Reed prevail in an adversary proceeding on his reverse piercing/alter ego claim, nothing precludes Rabex–Colorado's unsecured creditors from seeking this same sort of protection should the facts and circumstances so warrant.

### III. *CONCLUSION.*

This entire exercise on appeal presupposes that Reed, in an adversary proceeding, will prove his reverse piercing/alter ego theory of holding Rabex–Colorado liable for the Florida judgment against Rabex–Japan. As Debtors argue at length in their opening brief, the viability of this theory under Colorado law is dubious at best, yet, it was assumed for purposes of confirmation under

§ 1129 and must be assumed for purposes of appeal. Nothing, however, precludes Appellants from raising the issue of subordination when, and if, Reed's claim is allowed.

■ The bankruptcy court maintains equity jurisdiction post confirmation to revisit the question of subordination if and when the factual predicates to support it are demonstrated. If Reed's claim is allowed and if the facts demonstrate that Reed or Rabex–Japan's creditors were engaged in a fraudulent scheme or that the "true nature" of the transaction between Reed and Rabex–Japan or its creditors was such that equity would support paying Rabex–Colorado creditors from Rabex–Colorado's assets first, then the bankruptcy court could so order. The bankruptcy court's August 13, 1998, Order Denying Confirmation of Plan is AFFIRMED.

such a manner that when one of its creditors came to collect her just debt, the bulk of the assets had disappeared into another Litton company." *Id.* at 311–12, 60 S.Ct. 238. "No matter how technically legal each step in [the insider's] scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it." *Id.* at 312, 60 S.Ct. 238. In *Litton,* it

was the claimant who was acting as an alter ego of the debtor and whose conduct, therefore, warranted subordination of his claim. In the present case, the alter ego claim relates to the Rabex entities, not Reed or the L & N estate he represents. Again, Reed's claim is more aptly analogized to the bank's claim in *Sloan,* not the insider's deferred salary claim in *Litton.*